# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Willis Electric Co., Ltd., | Case No. 15-cv-3443-WMW-KMM |
| Plaintiff, | |
| v. | **ORDER** |
| Polygroup Trading Limited, Polygroup Limited (Macao Commercial Offshore), Polygroup Macau Limited (BVI), Polytree (H.K.) Co. Ltd., | |
| Defendants. | |

This matter is before the Court on three separate nondispositive motions filed by the Defendants, which are referred to collectively in this Order as "Polygroup." The background of this case is well-known to the Court and counsel, as substantial litigation has already occurred since the original complaint was filed in August 2015. Generally speaking, the Plaintiff, Willis Electric Co., Ltd. ("Willis"), alleges that it holds patents for several innovations in the design and construction of pre-lit artificial-trees and that Polygroup infringes Willis's patent rights through the sale of its own artificial trees. Willis also alleges that Polygroup has engaged in anticompetitive conduct in violation of both federal and state law. In its pending motions, Polygroup asks the Court to order the following: compel Willis to provide discovery; allow Polygroup to amend its prior art statement; and grant Polygroup leave to amend its answer to add a counterclaim for inequitable conduct. For the reasons that follow, the motion to compel is granted in part and denied in part, and the motions to amend the prior art statement and to add an inequitable-conduct counterclaim are denied.

## I.   Motion to Compel

Polygroup's motion to compel involves three areas of discovery. First, Polygroup asserts that Willis improperly claimed privilege over an April 12, 2012 email and the photo and video files attached to that email. Willis produced the email and attachments on July 17, 2020, but later clawed these documents back pursuant to the terms of the Protective Order.

Polygroup argues that Willis should be compelled to produce the email, the attachments, and related deposition testimony. Polygroup also asks the Court to compel Willis to search for and produce other photos, videos, and physical evidence similar to the subject matter of the April 12th email's attachments. In addition to the privilege issue, Polygroup seeks an order compelling Willis to make Sun Lin, a Willis employee, available for a deposition. During the January 13, 2021 hearing on Polygroup's motion, the Court granted this request on the record, but advised the parties that the scheduling and taking of Lin's deposition was not to affect the previously scheduled claim-construction hearing. Finally, Polygroup seeks an Order compelling Willis to produce company-wide and group-level financial statements. Having already ruled on the Lin deposition dispute, this Order discusses only the privilege issues and the requested discovery of financial statements.

### A.   Privilege

On July 17, 2020, Willis produced an April 12, 2012 email ("the April 12th email") from W.K. Wei to Johnny Chen. Attached to the email are several photos and videos. [Decl. of Puja Patel Lea ("Lea Decl.), Exs. 1–12, ECF Nos. 555, 557.] At the time he sent the email, W.K. Wei was a factory-based Willis employee in charge of information technology and computer systems.[1] [Lea Decl., Ex. 13 ("12/1/20 Chen Dep.") at 118]. Mr. Chen is Willis's General Manager, a position akin to a chief executive officer. He is also the inventor of the patents-in-suit.

The April 12th email was not sent by or to an attorney; nor was an attorney copied on the message. The body of the email does not refer to a request for legal advice. [Lea Decl., Ex. 1.] The subject matter of the email and the attachments is a prototype of a Polygroup connector[2] that was not yet available on the market in April of 2012. It is unclear how Mr. Wei, or anyone else at Willis, came to possess their competitors' prototype connector.

---

[1]   Mr. Wei is apparently no longer a Willis employee.

[2]   Very generally, Willis's infringement claims involve connections between various segments of artificial pre-lit trees that can conduct electricity through a central trunk to other portions of the tree. [*See* Third Am. Compl. ¶¶ 99–178 (Counts I–VI), ECF 506.]

Oddly, the April 12th email is addressed "Dear John," but John is not Mr. Chen's English name. [Lea Decl., Ex. 1; Decl. of Johnny Chen ("Chen Decl.") ¶ 2, ECF No. 589.] His English name is "Johnny," which is treated as a separate name in both Taiwan and China. Mr. Chen has never been called "John" by W.K. Wei or anyone else at Willis. [Chen Decl. ¶ 2.] Willis's patent counsel, on the other hand, is named John Fonder. Mr. Fonder has known Mr. Chen for over a decade. During that time, Mr. Fonder has never referred to Mr. Chen as "John", nor ever heard anyone else do so. [Decl. of John Fonder ("Fonder Decl.") ¶ 3, ECF No. 590.]

When Polygroup took Mr. Chen's deposition in December of 2020, its counsel showed him the April 12th email. [12/1/20 Chen Dep. at 116–17.] Mr. Chen recognized that the email appeared to be from W.K. Wei to him, but he noted that the use of the "Dear John" greeting was odd. [*Id.* at 117–18.] He testified that he thought it might have been an email to Mr. Fonder. [*Id.*] Willis's counsel defending the deposition, Patrick Arenz, contacted his colleague, Emily Niles, to see if Ms. Niles could determine whether the email was privileged. [Decl. of Emily Niles ("Niles Decl.") ¶ 3, ECF No. 588.] Polygroup's counsel questioned Mr. Chen about the April 12th email for some time, but eventually Mr. Arenz objected to further inquiry after Ms. Niles determined that the email appeared to be a draft of a privileged communication. [12/1/20 Chen Dep. at 130–31, 135–36.]

Mr. Chen does not now remember the specifics of the April 12th email. However, he asserts that "it is very common for individuals like Mr. Wei to draft emails for me to send to John Fonder to help Willis Electric seek legal advice." [Chen Decl. ¶ 7.] Mr. Chen believes the April 12th email was just such a draft email to Mr. Fonder. [*Id.* ¶ 8.] Mr. Fonder notes that he has collected and produced records from his current law firm in connection with this litigation, but he did not locate a copy of the April 12th email in his files. [Fonder Decl. ¶¶ 5–6.] His current firm's records are not complete, however, because the transfer of client records from his previous firm resulted in some materials being lost. [*Id.* ¶ 5.] As a result of Polygroup's motion, Mr. Fonder reviewed other emails he exchanged with Mr. Chen in April 2012. These other emails have the same subject line as the April 12th email, and Mr. Fonder determined that they all relate to the same subject matter. [*Id.* ¶ 6.] These other emails from April 22, April 23, April 25, and April 30, 2012 appear as entries 200–203 and 2412–2413 on Willis's privilege log. [*Id.*; Niles Decl. ¶ 3.] These other messages were submitted to the

Court for *in camera* review, and part of the email string includes an April 13, 2012 email from Mr. Fonder to Mr. Chen with the same subject line as the April 12th email.

Pursuant to a provision in the parties' stipulated Protective Order, Willis clawed back the email as having been inadvertently produced, and asserted privilege as to parts of Mr. Chen's deposition transcript. [Protective Order ¶ 12.] Polygroup disputes Willis's claim of privilege over both the email and the photo and video attachments. Polygroup further claims it was inappropriate for Willis to claw back Mr. Chen's deposition testimony regarding the April 12th email. And Polygroup argues that Willis should now be required to produce all unprivileged documents in its possession, custody, or control that refer or relate to Polygroup's prototype connector.

### Legal Standard[3]

As the proponent of the privilege, Willis bears the burden of establishing that it applies. *Triple Five of Minnesota, Inc. v. Simon*, 212 F.R.D. 523, 527–28 (D. Minn. 2002) (citing *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985)). The attorney-client privilege protects communications that are (1) confidential; (2) between an attorney and a client; and (3) for the purpose of obtaining legal advice. *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977), *rev'd in part on other grounds*, 572 F.2d at 606 (en banc opinion). This protection extends to communications involving corporate employees when the following elements are satisfied:

> The attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the

---

[3] Willis's Third Amended Complaint alleges claims under both federal law and Minnesota law. Polygroup acknowledges this reality in its memorandum and asserts that the Court must analyze issues of attorney-client privilege under both federal common law and Minnesota state law. Def.'s Mem. at 10 [ECF No. 553]. However, neither party argues that the result is different depending on the body of privilege law applied, and both sides focus almost exclusively on federal cases. Because the parties appear to agree that the source of attorney-client-privilege law does not affect the outcome of this case, the Court will not separately evaluate the privilege issues in this case under Minnesota law.

communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.

*In re Bieter Co.*, 16 F.3d 929, 936 (8th Cir. 1994); *Ewald v. Royal Norwegian Embassy*, No. 11-cv-2116 (SRN/SER), 2014 WL 1309095, at *7 (D. Minn. Apr. 1, 2014).

### Use of Clawed Back Material

Before turning to the application of the attorney-client privilege to the information clawed back by Willis, the Court addresses Willis's argument that the motion to compel should be denied because Polygroup improperly references the substance of the April 12th email and attachments in its supporting papers. Pl. Mem. at 6 [ECF No. 587.] Willis concedes that the Protective Order allows Polygroup to submit the clawed-back materials to the Court in connection with the motion, but Willis argues that Polygroup ran afoul of the Protective Order and Federal Rule of Civil Procedure 26 by discussing the substance of the documents in its memorandum and crafting its argument around information that was the subject of a privilege claim. *Id.* Essentially, Willis asks the Court to deny the motion to compel as a sanction for Polygroup's alleged non-compliance with the Protective Order and the Federal Rules. The Court declines Willis's invitation to impose such a sanction.

Rule 26 provides, in relevant part, that when a party makes a claim of privilege over materials produced in discovery, it may notify the receiving party of the privilege claim and the receiving party "must promptly return, sequester, or destroy the specified information and any copies it has." Fed. R. Civ. P. 26(b)(5)(B). The receiving party is also admonished that it "must not use or disclose the information until the claim is resolved…; and may promptly present the information to the court under seal for a determination of the claim." *Id.*[4] The relevant provision of the Protective Order entered by the Court in this case mirrors these requirements. Protective Order ¶ 12 (providing that Rule 26(b)(5)(B) and Fed. R. Evid. 502 apply in this case and requiring a receiving party to segregate clawed-back documents to

---

[4]     The relevant advisory committee notes for Fed. Civ. P. 26(b)(5)(B) provide the following guidance: "In presenting the question, the party may use the content of the information only to the extent permitted by the applicable law of privilege, protection for trial-preparation material, and professional responsibility." Fed. R. Civ. P. 26(b)(5)(B), advisory committee notes (2006 Amendment).

"protect them from use" but allowing the party to attach the documents under seal to a motion to resolve a disputed claim of privilege).

Neither Rule 26(b)(5)(B) nor the Protective Order explicitly states that a receiving party is prohibited from reviewing or referencing the content of the clawed back information when challenging the producing party's privilege claim. But the weight of authority examining this issue suggests that the better course of action is for the receiving party to cease all review of the allegedly privileged material once it is notified of a privilege claim. *See, e.g.*, *United States Equal Empl. Opportunity Comm'n v. George Wash. Univ.*, Case No. 17-cv-1978 (CKK/GMH), 2020 WL 6504573 (D.D.C. Nov. 5, 2020) (concluding that the EEOC's choice to review clawed back materials "after the University informed the agency that it claimed privilege over those communications—violated Rule 26(b)(5)(B)");[5] *Ewald*, 2014 WL 1309095 at *13 (finding that the plaintiff's reading aloud from a clawed-back document during a public hearing constituted prohibited "use" of the document under Fed. R. Civ. P. 26(b)(5)(B)); *but see Irth Solutions, LLC v. Windstream Commc'ns LLC*, Civil Action 2:16-cv-219, 2017 WL 3276021 (S.D. Ohio Aug. 2, 2017) (denying the defendant's motion for sanctions where plaintiff's counsel reviewed materials after a clawback notification, but treated the information as attorney eyes only material and where the parties' "clawback agreement was ambiguous and deficient").

There are good reasons for following the interpretation of Rule 26(b)(5)(B) adopted in *George Washington University*, *Ewald*, and other cases. For one thing, such a bright-line rule provides significant protection to assertedly privileged material pending resolution of a dispute. For another, it returns the parties to the positions they would have held while litigating a claim of privilege had no inadvertent disclosure occurred. Indeed, parties are often forced to dispute a claim of privilege without having access to the content of the communication itself. However, in a situation like this case, where a party has had the

---

[5]     The court in *George Washington University* collected several cases to support the proposition that a receiving party's review of disputed materials pending the ruling essentially usurps the court's responsibility for resolving the challenged claim. 2020 WL 6504573, at *4. The court the cited several decisions supporting the conclusion that under Rule 26(b)(5)(B), a party should not review the material after a claim of privilege is made. *Id.* And the court reasoned that such an "exacting" rule "serves the goal of safeguarding attorney-client confidentiality." *Id.*

allegedly privileged document for several months and ultimately used it in a deposition before a clawback demand was even made, strict application of such a rule asks the court and the parties to engage in a somewhat impractical fiction. Even without ever further reviewing or quoting directly from the April 12th email, Polygroup's counsel were certainly familiar with its content well before privilege was claimed. The thoroughness of the briefing, some of which was based on Polygroup's knowledge of the April 12th email's substance, has been useful to the Court in understanding the parties' positions. Here, unlike in *Ewald*, Polygroup took reasonable steps, including filing its memorandum and the exhibits under seal, to avoid publicly disclosing the allegedly privileged material. And to the extent it is relevant, nothing in the disclosed email or its attachments ever alerted Polygroup to the idea that it might be privileged, and that its disclosure may have been inadvertent.

Ultimately, the Court concludes that it is unnecessary to decide whether Polygroup's discussion of the allegedly privileged materials in its briefing was appropriate. Willis has failed to explain why the Court should decline to make a ruling on a disputed privilege claim and cites no authority requiring or even counseling the application of such a sanction under circumstances like these. And denying the motion without consideration of the merits would not employ the Federal Rules of Civil Procedure in a manner designed to "secure the just, speedy, and inexpensive determination" of this proceeding. Fed. R. Civ. P. 1. The Court concludes that the privilege issue is ripe for consideration and should be addressed.

### The April 12th Email

Given a careful review of the record, the Court finds that Willis has shown that the April 12th email is a privileged attorney-client communication. First, the Court is persuaded by Willis's attestation regarding the nature of the email: the April 12th email is most likely a draft communication that was later sent to Mr. Fonder. Though the email is not between an attorney and client, Mr. Chen's and Mr. Fonder's declarations regarding the "Dear John" greeting and its mismatch with Mr. Chen's English name reasonably support the conclusion that this was such a draft message. Admittedly, Mr. Chen does not recall the circumstances of receiving this specific message from Mr. Wei. But the message fits Mr. Chen's described business practice of asking employees, including Mr. Wei, to send him drafts of emails for Mr. Fonder to review so that legal advice could be obtained by Willis regarding its own patents. *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, No. 15-cv-3183 (ADM/LIB),

2017 WL 9325027, at *4 (D. Minn. May 5, 2017) (noting that corporate employee communications are privileged when the employee makes the communication at the direction of a corporate superior and the subject of the communication was within the employee's corporate duties).

Second, the message was not widely disseminated, having been sent only to Willis's general manager, Mr. Chen. *Id.* (requiring a corporate employee communication to be sent only to those who need to know its contents). Third, based on the Court's review of Willis's *in camera* documents, it appears the April 12th email was, indeed, prepared for Mr. Fonder in connection with a request to receive legal advice. This is true even though Willis and its patent counsel have not found a copy of the April 12th email that Mr. Chen ultimately sent to Mr. Fonder. The *in camera* messages strongly support this finding. These emails include Mr. Fonder's April 13th response to an unidentified email from Mr. Chen that has the same subject line as the April 12th email. *Id.* (requiring a communication to be made for the purpose of securing legal advice).

For these reasons, the Court finds that the April 12th email is protected by the attorney-client privilege and that Willis properly clawed back the email. Accordingly, Polygroup's motion is denied to the extent it seeks an order compelling Willis to disclose the April 12th email itself.

### The Attachments to the Email

The parties next disagree regarding the application of the attorney-client privilege to the April 12th email's photo and video attachments. For the following reasons, the Court concludes that the photos and videos of the Polygroup prototype depicted in the attachments are not protected by the attorney-client privilege. Under the circumstances presented, Willis will be required to search for other versions of this photo and video evidence. If no other versions are located, the parties will be required to meet and confer regarding a method for Willis's production that dissociates the images and videos from the attachments to the privileged communication.

In *Upjohn Co. v. U.S.*, the Supreme Court held that attorney-client privilege only protects disclosure of communications, and that it does not protect disclosure of underlying facts. 449 U.S. 383, 395 (1981) ("[T]he protection of the privilege extends only

to *communications* and not to facts." (quoting *Philadelphia v. Westinghouse Electric Corp.*, 205 F. Supp. 830, 831 (E.D. Pa. 1962)) (internal quotation marks omitted) (emphasis in original)). In the era of e-discovery, lower courts have differed with respect to how *Upjohn*'s holding applies to email attachments. Lower courts agree that an otherwise-discoverable attachment to a privileged email to counsel is not *automatically* cloaked in privilege.[6] But lower courts have not always been clear about what protection—if any—applies to such attachments and have taken two different (although arguably not entirely distinct) approaches to independently-discoverable attachments.

A large set of lower courts have interpreted *Upjohn* to mean that even though the underlying content of the independently-discoverable attachments is not privileged, the act

---

[6]     *See, e.g., Sneider v. Kimberly-Clark Corp.*, 91 F.R.D. 1, 4 (N.D. Ill. 1980) (explaining that automatically cloaking independently discoverable attachments in privilege would "abrogate the well-established rule that only the communications, not underlying facts, are privileged") (citation omitted); *Jane Doe, Plaintiff, v. Intermountain Health Care, Inc. & SelectHealth, Inc., Defendants*, No. 2:18-CV- 807-RJS-JCB, 2021 WL 151090, at *2 (D. Utah Jan. 16, 2021) (emphasizing that "a document that was not privileged in the client's hands cannot magically become privileged merely by sending it to an attorney in search of legal advice") (citation omitted); *Hilton-Rorar v. State & Fed. Commc'ns Inc.*, No. 5:09-CV-01004, 2010 WL 1486916, at *7 (N.D. Ohio Apr. 13, 2010) ("Unless the [attachment] itself is protected under another privilege, transfer by a client to an attorney of an independent or pre-existing document . . . that [does] not arise out of the attorney-client relationship . . . does not bring the document within the attorney-client privilege") (citations omitted); *Renner v. Chase Manhattan Bank*, No. 98 CIV. 926 (CSH), 2001 WL 1356192, at *5 (S.D.N.Y. Nov. 2, 2001) ("I reject the assumption, implicit in defendants' presentation, that documents for which no claim of privilege could be asserted become cloaked with privilege solely because [a party] sent them to his attorney."); *Leonen v. Johns–Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990) ("Merely attaching something to a privileged document will not, by itself, make the attachment privileged.") (citation omitted); *see also, e.g., Fed. Trade Comm'n v. Boehringer Ingelheim Pharm., Inc.*, 180 F. Supp. 3d 1, 34-35 (D.D.C. 2016) (holding that the contents of disputed attachments were privileged because they contained analyses requested by in-house counsel for a significant purpose of providing legal advice to defendant corporation) (citations omitted); *Eastman Kodak Co. v. Agfa-Gevaert N.V.*, No. 02-CV-6564 T-F, 2006 WL 1495503, at *4 (W.D.N.Y. Apr. 21, 2006) (holding that the content of documents attached to an emailed invention report were privileged only because the documents were "prepared seeking the same legal advice or services as the invention report, namely, procuring a patent").

of sending the attachments is privileged.[7] These courts view such an approach as faithful to *Upjohn*'s decree that "[a] fact is one [discoverable] thing and a *communication* concerning that fact is an entirely different [and undiscoverable] thing." 449 U.S. 383 at 395 (internal quotation marks and citation omitted). By separating the act of attaching a document to an email from the attachment's *contents*, these lower courts maintain that they are safeguarding against exposure of the substance of the otherwise-privileged email. These courts are concerned that if the act of attachment were disclosed, opposing counsel would be able to "reverse engineer" the contents of the otherwise-privileged email from the attachments. *See, e.g.*, *Muro*, 250 F.R.D. at 363 (emphasizing the "reverse engineering" rationale in its holding that attorney-client privilege protected against disclosing attachments *qua* attachments); *Hilton-Rorar*, 2010 WL 1486916, at *8 (same). As the Northern District of Ohio explained in *Hilton-Rorar*, forcing counsel to disclose the inclusion of specific attachments on privileged emails "would undercut a bedrock principle underlying the attorney-client privilege, [which is that] the privilege [exists to encourage] clients to make full disclosure[s] to their lawyers." 2010 WL 1486916, at *8.

Another group of lower courts do not extend the privilege to independently discoverable email attachments. According to these cases, for the attorney-client privilege to apply to attachments, each attachment must qualify for the privilege.[8] For example, the District of Utah's recent decision in *Intermountain Health Care* found that the Supreme Court's

---

[7]     *See, e.g.*, *Gen. Elec. Co. v. United States*, No. 3:14-CV-00190 (JAM), 2015 WL 5443479, at *1 (D. Conn. Sept. 15, 2015) (citing *Upjohn* for the proposition that "information communicated to an attorney in connection with obtaining or rendering legal advice is properly subject to a claim of privilege, even if the information standing alone would not otherwise be subject to a claim of privilege"); *U.S. v. Davita, Inc.*, 301 F.R.D. 676, 683–84 (N.D. Ga. 2014) (same); *Hilton-Rorar*, 2010 WL 1486916, at *8 (N.D. Ohio Apr. 13, 2010) (same); *Barton v. Zimmer Inc.*, No. CIV.A. 1:06-CV-208, 2008 WL 80647, at *5 (N.D. Ind. Jan. 7, 2008) (same); *In re Vioxx Products Liability Litigation*, 501 F. Supp. 2d 789, 806 (E.D. La. 2007) (same); *Muro v. Target Corp.*, 250 F.R.D. 350, 363 (N.D. Ill. 2007) (same).

[8]     *See, e.g.*, *Leonen*, 135 F.R.D. at 98 (D.N.J. 1990) (holding that the attachments must independently satisfy the requirements for attorney-client privilege to receive protection) (citation omitted); *Intermountain Health Care*, 2021 WL 151090, at *7 (D. Utah Jan. 16, 2021) (same); *U.S. ex rel Scott v. Humana, Inc.*, No. 3:18-CV-61-GNS-CHL, 2019 WL 7404032, at *3 (W.D. Ky. Sept. 24, 2019) (same); *Boehringer*, 180 F. Supp. at 35 (same); *Draus v. Healthtrustorporated-The Hosp. Co.*, 172 F.R.D. 384, 393 (S.D. Ind. 1997) (same).

decision in *Fisher v. U.S.*, 425 U.S. 391 (1976),[9] compelled the production of email attachments and criticized other rulings that recognized some limited protection for those attachments. 2021 WL 151090, at*3. The court asserted that *Hilton-Rorar*, *Barton*, and *Muro* ignored *Fisher* and allowed a client to avoid production of otherwise discoverable documents by merely showing that "they were transmitted with an email … that is privileged…." *Id.*

Having reviewed the relevant case law in this area, the Court is convinced that the approach taken by those courts recognizing some limited protection for email attachments is the better reasoned of the two lines of cases for three reasons. First, the Court respectfully believes that *Intermountain Health Care* misreads decisions like *Hilton-Rorar*, *Barton*, and *Muro*. These decisions do not cloak the underlying contents of the email attachments in privilege, but only protect a party from having to disclose that those specific documents were sent to counsel in connection with a request for legal advice. Second, neither *Fisher* nor *Upjohn* is inconsistent with the approach taken by the lower courts that have recognized some limited protection for email attachments.[10] Third, requiring disclosure of the attachments themselves creates a risk that an opponent may reverse engineer the substance of a client's request for legal advice. However, even under this rule that extends some protection to attachments, "[o]nly the instance of a document attached to a communication with counsel is privileged by virtue of attorney-client privilege; other copies of the same document do not acquire an abiding immunity from discovery based on counsel's former or future involvement." *Sunshine*, *supra* note 11, at 63–64.

Photographs and videos of a competitor's products are just the sort of pre-existing, non-privileged documents that do not become protected from disclosure simply because

---

[9]    *Fisher* required several taxpayers' attorneys to turn over financial analyses that had been given to the attorneys by their clients. 425 U.S. 396. The Supreme Court emphasized that "pre-existing documents which could have been obtained by court process from the client when he was in possession [of the documents] may also be obtained from the attorney by similar process following transfer by the client in order to obtain more informed legal advice. *Id.* at 403.

[10]    *See also* Jared Sunshine, *The Part & Parcel Principle: Applying the Attorney-Client Privilege to Email Attachments*, 8 J. Marshall L.J. 47, 66 n.73 (2014) (arguing that "*Fisher* and *Upjohn* do not point in contradictory directions" and citing *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 825 F.2d 676, 679 (2d Cir. 1987), for the proposition that "pre-existing non-privileged documents can be discovered independently from the client's or attorney's files").

they are sent to counsel. Under *Upjohn* and its progeny, Willis could invoke the attorney-client privilege and refuse to answer a discovery request if Polygroup were to ask: "What photos and videos of Polygroup products have you sent to your counsel?" But justifiably refusing to share the answer to that question does not mean that Willis's pre-existing photo and video files are not otherwise discoverable. 449 U.S. at 395. "If legal advice is requested regarding the attachments, the communication with the attorney is privileged. Whether the attachments as independent documents are discoverable is a separate question." *Rainey v. Plainfield Comm'y Consol. Sch. Dist. No. 202*, No. 07 C 3566, 2009 WL 1033654, at *2 (N.D. Ill. Apr. 16, 2009) (concluding that communications from the media and parents that were forwarded to an attorney for legal advice, including any attachments, were privileged, but that the "communications as originally received [by school officials] from the media or parents still must be disclosed to the extent they are responsive to a proper discovery request").

If this were an ordinary case, Polygroup's discovery requests that seek production of the photos and video files would have led to the production of the photos and videos that were attached to the April 12th email as independent documents located elsewhere in Willis's repository of electronically stored information.[11] However, this case presents a practical challenge that is not present in the ordinary case. At the hearing, Willis's counsel represented that other than the photo and video files attached to the April 12th email, Willis had so far located no other electronic copies of the images and video files at issue. This is not altogether surprising given that the electronic files were created nearly nine years ago and may have been generated by Mr. Wei, who is no longer employed by Willis. And although Willis has searched its electronic files using search terms, and these photos and videos were have not turned up, there is no indication that they have searched for them specifically. Willis argues that it should not be required to disclose these images and videos because it would essentially give Polygroup a window into the matters about which Willis sought legal advice. But Willis did not direct the Court to any authority holding that the privilege would shield such otherwise discoverable materials from view under these circumstances. Nor has

---

[11]    *See* Def.'s Mem. at 19–20. More than one of Polygroup's Rule 34 Requests sought documents that should reasonably have led to the production of the attachments. The Court is not persuaded by Willis's suggestion that the information is not discoverable because it is not covered by any of Polygroup's cited document requests. Pl.'s Mem. at 11–12.

Willis presented any evidence showing that the photographs and videos of the Polygroup prototype are independently privileged.

Accordingly, the Court concludes that though the fact of attachment of the photos and videos to the April 12th email as part of the draft communication to patent counsel is protected, the pre-existing photos and videos are independently discoverable. Prior to the filing of Polygroup's motion, Polygroup asked Willis to search for other versions of the photographs and videos, including the physical connector at issue, but Willis declined to do so. Def.'s Mem. at 8 (citing Lea Decl., Ex. 16 at 1). The Court finds that Willis must now conduct a reasonable search to determine whether other versions of the photos and video files exist that are not tied to any privileged communication. If that search reveals other copies not previously located by Willis, Willis must produce those images and video files. If other versions cannot be found after a reasonably diligent search, then Willis must produce the photos and videos at issue.[12] In addition, Willis must conduct a reasonable search to locate the physical prototype connector depicted in the photos and videos, and if it is located, produce that connector to Polygroup or allow for its examination.

### Mr. Chen's Testimony

Finally, Polygroup argues that Willis should not be permitted to claw back Mr. Chen's testimony regarding the April 12th email and the attachments. Specifically, Polygroup argues that testimony from pages 127–28 of Mr. Chen's deposition was improperly clawed back

---

[12]    In either event, the parties are required to meet and confer regarding a sensible timeline and method for Willis to conduct its search and to produce such photos and videos. The meet-and-confer process must include a discussion regarding how the photos and videos attached to the April 12th email could be produced to avoid revelation of Willis's request for legal advice. This Court makes the same observations as it did in another case dealing with a similar issue:

> It is possible that one solution would be for the documents at issue to be produced with new document identifiers so that the government could not readily infer which documents were believed to be important for which pieces of litigation and for what purposes. But the Court does not require that this method be used and the parties are free to arrive at a different agreement.

*United States v. Adams*, No. 017CR00064DWFKMM, 2018 WL 5311410, at *8 n.4 (D. Minn. Oct. 27, 2018), *aff'd*, No. CR 17-64 (DWF/KMM), 2018 WL 6446387 (D. Minn. Dec. 10, 2018).

because he was merely testifying about underlying facts concerning the prototype connector. However, based on a review of the relevant clawed-back testimony, the Court concludes that Willis properly invoked a privilege claim over the testimony. In the highlighted passage of the deposition transcript, Mr. Chen is asked several questions based on the substance of the privileged April 12th email itself. Some of the questions are in response to verbatim recitations of the privileged communication. The Court finds that Mr. Chen's testimony is so closely tied to the substance of Willis's inadvertently disclosed privileged email that it was proper for Willis to assert a claim of privilege over that testimony. Had Willis not made the inadvertent disclosure, the examination would not have included inquiry into the substance of the privileged communication, and it was properly clawed back. Polygroup's motion to compel is denied to the extent it seeks to invalidate Willis's privilege claim in this respect.

### B.   Financial Statements

The last issue raised in Polygroup's motion to compel concerns its request for Willis to produce company and group-level financial statements. Discovery rulings are left to the discretion of the district court. *See Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018). In relevant part, Federal Rule of Civil Procedure 26 provides the following standard for discoverable information:

> Unless otherwise limited by court order, … [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

*Vallejo v. Amgen, Inc.*, 903 F.3d 733, 742 (8th Cir. 2018) (quoting Fed. R. Civ. P. 26(b)(1)).

"Relevancy encompasses 'any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in this case.'" *Klein v. Affiliated Grp., Inc.*, No. 18-CV-949 DWF/ECW, 2019 WL 1307884, at *2 (D. Minn. Mar. 22, 2019) (quoting *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351 (1978)). Though this standard permits "a liberal scope of discovery, this Court possesses considerable discretion in determining the need for, and form of, discovery…." *Rodriguez v. Riley*, No. 19-CV-2707 (JRT/ECW), 2020

WL 4747610, at *2 (D. Minn. Aug. 17, 2020) (quoting *In re Nat'l Hockey League Players' Concussion Injury Litig.*, 120 F. Supp. 3d 942, 949 (D. Minn. 2015)).

In addition to meeting the relevance standard, "information sought in discovery … must also be 'proportional to the needs of the case.'" *Id.* (quoting Fed. R. Civ. P. 26(b)(1)). "In determining proportionality, courts consider numerous factors, including 'the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the relevant information, the parties' resources, and importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'" *Id.* (quoting *Beseke v. Equifax Info. Servs., LLC*, No. 17-CV-4971-DWF-KMM, 2018 WL 6040016, at *3 (D. Minn. Oct. 18, 2018)).

The parties dispute whether Willis's group-level and company-wide financial statements are relevant and proportional to the needs of the case. Polygroup asserts that the discovery is both relevant to Willis's claim for damages in the form of lost profits and proportional to the needs of the case because Willis has claimed to have very high profit margins and has made a large lost-profits claim. Def.'s Mem. at 32–34. Willis argues that it has already produced substantial information regarding profits, some costs, and other financial matters related to the specific pre-lit Christmas trees at issue in this case, so the less-focused, company-level data is not needed. Pl.'s Mem. at 25–26. The Court finds that the group-level and company-wide financial statements are not relevant to Willis's lost-profits claim. To the extent the documents have some tangential bearing on those claims, the Court finds that they are not proportional to the needs of the case.[13]

First, the relevance of the requested financial statements to a claim for lost profits is not as obvious as Polygroup suggests. Pre-lit artificial trees, around which this case is centered, are not the only products Willis sells. Pl.'s Mem. at 25. As a result, the company-wide financial statements, to the extent they reveal Willis's overall revenues, expenses, and profit margins, will not illuminate the issue of Willis's alleged lost profits for the specific trees that incorporate the patented innovations that are at issue in this litigation. The same is true of group-level financial statements that are not focused on the particular pre-lit artificial

---

[13]     Because of these findings, the Court does not reach the parties' other arguments concerning the discoverability of this information.

trees that Willis claims it has failed to sell due to Polygroup's alleged infringement. There is no indication in the record that the high-level financial statements being sought will illustrate any damages-related information that is referenced to the specific products Willis sells that practice the patented inventions. Though relevance is considered liberally under Fed. R. Civ. P. 26, the Court finds that the requested financial statements will not bear on the issue of lost profits and, as a result, the motion to compel is denied.[14] *Cf. Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC*, No. 1:CV-09-1685, 2011 WL 13199148, at *1–2 (M.D. Pa. Dec. 21, 2011) (denying motion to compel discovery of company-wide financial statements because the information would not be relevant to showing damages attributable to allegedly infringing products); *Thermal Solutions, Inc. v. Imura Int'l U.S.A.*, No. 2:08-cv-0220-JWL-DJW, 2009 WL 10668995, at *10 (D. Kan. Dec. 4, 2009) (denying a motion to compel the patent holder's financial statements because the information was not relevant to its claim for damages in the form of a reasonable royalty).

Moreover, even if these financial statements were considered to fall within the broad scope of relevance permitted under the Federal Rules, the production of the financial statements is not proportional to the needs of the case. Though Polygroup is correct that the very large lost profits claim Willis has attempted to support in this case would weigh in favor of a finding of proportionality, the amount in controversy is only one factor in assessing the propriety of discovery. If there were any relevance of the company-wide and group-level financial statements to a lost-profits calculation, that relevance would be tangential at best. For this additional reason, the motion to compel financial statements is denied.

---

[14]     In part, Polygroup argues that the financial statements are relevant because Willis's corporate designee admitted that Willis's own sales summary for individual trees purporting to illustrate its lost profits "fails to account for numerous significant cost categories that would necessarily lower Willis's purported margins." Def.'s Mem. at 30. Therefore, Polygroup suggests that the requested financial statements are needed to combat Willis's own evaluation of its lost profits. Willis's failure to take certain costs into account is perhaps a basis for a robust cross-examination of its expert, but the Court concludes that it does not make the over-inclusive financial statements that Polygroup seeks appropriate fodder for discovery. Indeed, there is no indication that the targeted cost information allegedly missing from the expert's analysis could be found in those statements.

## II.    Motions to Amend

Polygroup seeks permission to amend its prior art statement to add a reference to an artificial Christmas tree known as the Mount Washington Pine. Willis sold the Mount Washington tree prior to 2010, so Polygroup argues that it is relevant and particularly persuasive prior art that could invalidate U.S. Patent No. 9,066,617 (the '617 Patent). In addition, Polygroup seeks leave to amend its answer to add an inequitable-conduct counterclaim. According to Polygroup, Willis's alleged failure to disclose the Mount Washington tree to the United States Patent and Trademark Office when it applied for the '617 Patent gives rise to a claim of inequitable conduct. Because the Court finds that Polygroup failed to act diligently in pursuing its proposed amendments, both motions are denied.

### A.  Background

The '617 Patent was issued on June 30, 2015, based on an application filed in October of 2012. [617 Patent, ECF No. 23-5.] Although Willis did not include any claims related to the '617 Patent in its original complaint filed in August 2015, in December that year it amended its claims to assert Polygroup's infringement of the '617 Patent. ECF No. 23. Willis asserts that the invention for the '617 Patent dates back to the middle of 2010. [Decl. of Rachel Hughey ("Hughey Decl."), Ex. 17 at 6.]

The '617 Patent describes a mechanical coupling mechanism for an artificial tree that includes three sections. The invention reflected in the '617 Patent has to do with the way various sections of the artificial tree trunk are joined together. In Figure 2, for example, the connector for the two trees shows the upper end of one section of the tree that accepts a sleeve to be inserted into the first section's hollow upper end. The upper end is notched, and there are ridges on the inside of the sleeve. The lower end of the next section of the sleeve has a male connector that slides into the ridged sleeve.



[617 Patent, Fig. 2.] Such a connector can be used to join several sections of a multi-part tree. [*Id.*, Fig. 1

Figure 11 shows an optional, ornamental tree topper and the connector used to join it with another section of the tree.



['617 Patent, Fig. 11.] Although the tree topper connector is depicted in one of the 11 drawings in the '617 Patent, none of the Patent's 16 claims specifically discusses a tree-topper connector or configuration.

In March 2016, Polygroup served discovery on Willis, seeking prior art evidence, including trees sold by Willis in the United States before 2010. [Hughey Decl, Ex. 5 at 12 (Request for Production No. 5).] Although Willis resisted discovery of information about

pre-2010 tree sales, in a previous order the Court found "that information about trees from 2008 through the alleged invention date is generally discoverable, agreeing that Polygroup is entitled to obtain discovery that is more specific than the very broad acknowledgment in Willis's patent documents." [Order (Mar. 11, 2020) at 5, ECF No. 510.] Nevertheless, in light of the large number and variety of trees at issue, the Court "agreed with Willis that this prior art discovery could quickly become so vast as to be disproportionate to the needs of the case." [*Id.*] The parties were ordered to meet and confer to arrive at an agreed-upon sampling of a defined subset of trees. [*Id.*]

Following the parties' meet and confer about Willis tree sales from 2008–2010, and after Willis's change of counsel in early June 2020, Willis produced documents including some limited CAD drawings and Assembly Instructions for the Mount Washington tree. [Decl. of Patrick Arenz ("Arenz Decl."), Ex. F & N, ECF No. 585.] Around this time, Polygroup's counsel located what they believed to be a sample of a Mount Washington tree in counsel's own law firm's storage area, but it turned out that the box contained a misplaced Polygroup tree; the Mount Washington tree was in the same storage area, but it had been mistakenly placed in a box for a different Willis tree. [Decl. of Christopher Forstner ("Forstner Decl.") ¶¶ 15–23, ECF No. 565.] Eventually, on December 1, 2020, in response to a request for more detailed CAD drawings of the components incorporated in the Mount Washington tree, Willis produced part-level drawings. [Hughey Decl., Ex. 6; Arenz Decl. ¶ & Ex. M.] Those CAD drawings, according to Polygroup, revealed for the first time that the Mount Washington tree included a tree topper connector similar to the one depicted in Figure 11 of the '617 Patent. During a 30(b)(6) deposition, Willis's corporate representative, Johnny Chen, testified that the tree topper connector depicted in the CAD drawings was used by Willis dating back to 2008. He further testified that everyone else in the pre-lit tree market has been using a similar tree topper connector "for years," and that Willis continues to use it today. [Hughey Decl., Ex. 4, 30(b)(6) Dep. of Johnny Chen, at 187–88, 194–95.]

However, as the discovery of the Willis tree in counsel's office reveals, Polygroup was aware of the Mount Washington tree's existence before Willis's July 2020 document production or its disclosure of detailed CAD drawings in early December 2020. After Polygroup's counsel asserted that the Mount Washington tree was invalidating prior art, Willis asked Polygroup to describe its efforts to obtain a pre-2010 Willis Electric Mount Washington tree. [Arenz Decl., Ex. B at 10.] In response to that interrogatory, on December

7, 2020 Polygroup stated that "its counsel obtained a pre-2010 Mount Washington Tree on behalf of another client in the fall of 2009." [*Id.*] The other client to whom this interrogatory most likely refers is another Polygroup entity called GP, Ltd., which sued Polygroup for patent infringement related to the lighting of artificial trees in 2009. [*Id.*, Ex. C.] GP, Ltd.'s complaint specifically alleges that the Mount Washington tree infringed a tree-lighting patent, [*id.*, Ex. C at 4, ¶ 12], and the tree found in defense counsel's storage area likely dates to that time.

### B. Legal Standards

The two motions to amend at issue invoke distinct legal frameworks: those applicable to prior art amendments and those applicable to amending pleadings. However, the two legal standards share an emphasis on the diligence of the moving party in assessing whether the amendment should be allowed.

#### *Amending a Prior Art Statement*

Timely prior art disclosure serves the Court's and the parties' interest in efficiency by requiring parties to develop their infringement theories early in the case.

> Requiring parties to identify and commit to theories of liability early serves to focus discovery and to advance the efficient disposition of the case. The nature of a patent infringement claim or invalidity defense encourages strategies to delay producing information through discovery or otherwise until the opposing side has disclosed the basis for its claims, contributing to lengthy delays and high costs. One approach is for the court to require the parties to submit detailed statements of their claims and defenses early in the litigation either at the outset of the case, as part of a discovery scheduling order, or, where the accused product is unavailable or otherwise not subject to examination, following limited discovery.

*BreathableBaby, LLC v. Crown Crafts, Inc.*, No. 12-cv-94 (PJS/TNL), 2014 WL 3928526 at *3 (D. Minn. Aug. 12, 2014) (quoting 26 Fed. Proc., L.Ed. § 60:1156 Pretrial Conferences and Orders). Because requiring early prior art statements is intended to crystalize parties' theories of the case, the courts' approach to motions to amend them is "decidedly conservative." *Id.*

In order to amend a prior art statement to include additional references, the proponent of the motion must demonstrate three things: (1) that the proposed additional references "were not, and could not reasonably have been, located earlier"; (2) the proposed

references are not cumulative of prior art already included in the statement; and (3) the proponent's prejudice if leave is denied outweighs the prejudice that the nonmoving party would face if the motion was granted. *Multi-Tech Systems, Inc. v. Dialpad.com, Inc.*, No. 00-1540 (ADM/RLE), 2002 WL 27141 at *3 (D. Minn. Jan 8, 2002); see also Pretrial Scheduling Order, ECF No. 34 (restating the elements and requiring them for amendment of a prior art statement). In this case, the Court specifically required the proponent of a motion to amend a prior art statement demonstrate good cause. Pretrial Scheduling Order, ECF No. 34; *see also Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-2637 (SRN/BRT), 2016 WL 7377099 at *3 (D. Minn. Dec. 20, 2016) ("As a general matter, courts require a showing of 'good cause' before allowing late amendments to invalidity contentions."). Although the scheduling order did not specifically define good cause, courts generally consider five factors when determining if such a standard is met: (1) whether the moving party acted with diligence; (2) the importance and relevance of the proffered new prior art; (3) whether the motion is motivated by "gamesmanship"; (4) how difficult it is to locate the prior art; and (5) prejudice to the opposing party. *Id.* Diligence is "an absolute requirement." *Solutran*, 2016 WL 7377099, at *3 (citing *O2 Micro Int'l v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366 (Fed. Cir. 2006)). A showing of diligence requires the moving party to demonstrate: "(1) diligence in discovery the basis for amendment; and (2) diligence in seeking amendment once the basis for amendment has been discovered." *Id.*

### Amending Pleadings: Rules 15 and 16

In considering whether to permit amendment of a pleading to add a new claim not previously pled, a court generally applies the liberal amendment standards of Rule 15. *See* Fed. R. civ. P. 15(a)(2) (providing that a court should grant leave to amend freely where justice so requires). Familiarly, under this standard, leave to amend should be granted except where there is a showing of bad faith, dilatory motive, undue delay, failure to cure deficiencies in previous amendments, undue prejudice to the non-moving party, or futility of amendment. *Baptist Health v. Smith*, 477 F.3d 540, 544 (8th Cir. 2007).

However, when a court sets a deadline for amendment of pleadings in a scheduling order, and a party seeks leave to amend after that deadline expires, the court applies a more "exacting" standard. *Scheidecker v. Arbig Enters.*, 193 F.R.D. 630, 632 (D. Minn. 2000). The party seeking leave to amend must instead show that there is good cause for failing to

comply with the scheduling order's deadlines. Fed. R. Civ. P. 16(b)(4) (requiring good cause for modification of a scheduling order); *PHL Variable Ins. Co. v. Bank of Utah*, Civ. No. 12-1256 (ADM/JJK), 2013 WL 12140486, at *2 (D. Minn. Jan. 24, 2013) ("Because its motion is untimely, the Bank must show there is good cause under Rule 16(b)(4) to modify the schedule."). "The primary measure of good cause is the movant's diligence in attempting to meet the scheduling order's requirements. Our cases reviewing Rule 16(b) rulings focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order." *Harris v. FedEx Nat. LTL, Inc.*, 760 F.3d 780, 786 (8th Cir. 2014) (cleaned up).

A finding of good cause may exist where there has been a change in circumstances, governing law, or newly discovered facts. *Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 948 (8th Cir. 2012). But when the moving party had the information on which a newly proposed claim is based before the deadline for the amendment passed, then there is generally not good cause to grant an untimely motion to amend. *See, e.g.*, *National Credit Union Admin. Bd. v. CUMIS Ins. Soc., Inc.*, Civil No. 16-139 (DWF/LIB), 2018 WL 4829186, at *3–4 (D. Minn. Oct. 4, 2018) (concluding that the defendant did not act diligently in bringing an amended counterclaim where the defendant was aware of the facts on which it based its new claim before the deadline for amendment expired).

## C. Analysis

The deadlines by which Polygroup should have amended its answer and its prior art statement are both long past. The deadline for amending pleadings expired on November 27, 2019, and Polygroup filed its motion to amend its answer and add an inequitable-conduct counterclaim 13 months later. Accordingly, Polygroup must show that it acted diligently, but due to a change in circumstances, could not have met the November 2019 deadline.

Similarly, after the stay in this case was lifted, Polygroup's supplemental prior art statement was due May 29, 2019. Polygroup is likewise required to show that it acted diligently, meaning that the Mount Washington tree was not, and could not reasonably have been, located earlier.

Here, the Court concludes that Polygroup has failed to demonstrate the diligence required to allow untimely amendment of its pleadings or its prior art statement. First, the Court is significantly motivated by the unique reality that eleven years before Polygroup

22

sought to amend its counterclaim and prior art statement the Mount Washington tree was in Polygroup's counsel's possession and a Polygroup affiliate filed a lawsuit against Willis specifically alleging that the Mount Washington tree infringed Polygroup's own patent. Furthermore, the '617 Patent has been the subject of intense litigation for Polygroup for over four years, including a request in late 2016 for the Patent Trial and Appeals Board to institute an *inter partes* review proceeding regarding the '617 Patent's claims.[15] Polygroup therefore had countless opportunities and equally strong incentives to discover prior art, such as the Mount Washington tree, and other trees employing the contested connector, where were reportedly ubiquitous in the market.

Polygroup does not dispute that the Mount Washington tree was in its counsel's possession since 2009, nor that its affiliate was involved in a lawsuit about that very tree. However, Polygroup contends that it could not have acted sooner in seeking leave to amend its prior art statement or to add a counterclaim for inequitable conduct for several reasons. Polygroup asserts that it could not have brought either motion before early December 2020, when Willis produced detailed CAD drawings showing the design of the tree topper connector used in the Mount Washington tree and Johnny Chen testified about the use, pre-2010 use of the tree topper connector in many artificial trees, including those sold by Willis. [Def.'s Countercl. Mem. at 19–21, ECF No. 578; Def.'s Prior Art Mem. at 18–20, ECF No. 563.] But this argument overlooks the fact that any details about the tree topper connector that Polygroup learned from the CAD drawings and Mr. Chen's deposition were available to it long before it filed these motions.[16] Polygroup had access to the Mount Washington tree itself, including the physical tree topper connector. With that physical piece

---

[15]     The PTAB ultimately declined to institute an *inter partes* review proceeding regarding the '617 Patent.

[16]     The Court is not persuaded by Polygroup's argument that "the only reasonable conclusion" to be drawn from the timing of the CAD drawings' production is that Willis deliberately withheld the information from Polygroup until the eve of the discovery deadline. [Def.'s Prior Art Mem. at 19.] The Court deemed prior art trees fair game for discovery and instructed the parties to work cooperatively to address the issue. Willis provided information about the Mount Washington tree, and others in July 2020. When Polygroup asked for additional drawings regarding the Mount Washington tree in early November 2020, Willis's counsel investigated and turned over more detailed drawings in early December. This timeline does not suggest a willful refusal to provide relevant discovery.

of evidence in its counsel's possession since long before this lawsuit was even filed, it is a stretch to suggest that only with the CAD drawings and Mr. Chen's testimony could Polygroup have observed a resemblance between the tree topper connector used in the Mount Washington tree and that depicted in Figure 11 of the '617 Patent. All Polygroup and its counsel needed to do was look at the connector in its counsel's storage facility. Indeed, they could have drawn their own engineering diagrams directly from the tree topper itself.

Polygroup argues that, for two reasons, its counsel's possession of the Mount Washington tree since 2009 ought not vitiate its diligence argument. First it emphasizes that GP Ltd., which sued Willis regarding the Mount Washington tree, is a different corporate entity than the defendants in this case. Polygroup also highlights that the counsel who represented GP Ltd. in the 2009 suit against Willis are not the same attorney as Polygroup's counsel of record in this litigation. These distinctions do not change the Court's conclusion. Polygroup and Willis have been litigating over artificial tree patents for many years, including through their closely affiliated entities, like GP Ltd., and the companies are intimately familiar with each other because of that process. And the very same law firm that represented a Polygroup affiliate claiming that that tree infringed a patent held by the affiliate represents Polygroup in this case. Under these circumstances, the Court is not persuaded by Polygroup's suggestion that it could not possibly have learned sooner that the Mount Washington tree was potentially invalidating prior art or that Willis did not disclose its sale of the tree when it applied for the '617 Patent. All Polygroup would have needed to do was look back at its own complaint against Willis to see that the Mount Washington tree had been sold before 2010 and its lawyers would have needed to check their storage to locate the sample tree they had in their possession since 2009.

Nor is the Court convinced that Polygroup's belated attempts to amend should be excused because the Mount Washington tree was mistakenly placed in a box for another Willis tree. Polygroup took reasonable efforts to discover that boxing error once the Mount Washington tree box was located. But Polygroup certainly could have discovered this issue sooner had it done a reasonably diligent search for prior art. As noted, its affiliate, GP Ltd., had filed a lawsuit against Willis about the Mount Washington tree six years before this lawsuit was filed. Diligent investigation could have revealed the Mount Washington tree was in defense counsel's law firm's storage much earlier than it was ultimately discovered in this

case. Such diligence would have allowed Polygroup to have sorted out the mistaken boxing issue quite a bit sooner than it did.

Second, the Court's conclusion that Polygroup failed to act diligently is supported by the fact that Polygroup waited several months to file its motions to amend. On September 24, 2020, Polygroup's counsel wrote to Willis that it had "recently located" a Mount Washington tree that was sold by Willis before 2010. [Arenz Decl., Ex. H.[17]] Polygroup's counsel asserted that the Mount Washington tree provided "clear evidence of the 617 patent's invalidity" and Willis's failure to disclose it during the '617 Patent application process gave rise to an inequitable-conduct claim. [*Id.*] Though this issue was on Polygroup's radar as early as September, Polygroup did not file its motions to amend until December 30, 2020. Waiting several months to file the motions to amend after asserting that the Mount Washington tree proved the invalidity of the relevant patent and gave rise to an inequitable conduct claim is not diligence. *See Solutran*, 2016 WL 7377099, at *3–4 (affirming magistrate judge's ruling that the defendants failed to act diligently in seeking leave to amend invalidity contentions "as soon as the alleged prior art had been discovered").

Finally, with respect Polygroup's motion to amend its prior art statement, the Court observes that even aside from the fact that its counsel had the tree all along, Polygroup should not be allowed a belated amendment to its prior art statement because a diligent prior art investigation would have revealed the Mount Washington tree or a similar one using the allegedly ubiquitous tree toper connector. *Multi-Tech Systems.*, 2002 WL 27141 at *3 (requiring a party seeking to amend a prior art statement to show that the proposed additional references "were not, and could not reasonably have been, located earlier"). The two parties in this lawsuit have been litigating this case for a number of years, and as noted above, Polygroup has had every incentive to find allegedly invalidating prior art throughout that

---

[17]   In this same message, Polygroup took the position that its own tree, a Wesley Pine, "teach[es] all of the elements of the 617 patent," and the "Mount Washington Pine really does not disclose any more than the Wesley Pine." [Arenz Decl., Ex. H.] Though the Court finds that lack of diligence alone is sufficient to deny Polygroup's motion to amend its prior art statement, this email is also strong evidence that addition of the Mount Washington tree would be cumulative of other prior art references. Such a cumulative addition to Polygroup's prior-art statements would not serve the interests of the Court and the parties in in a case that already contains significant prior art disputes.

time. Given that the tree topper connector in the Mount Washington tree was widely used, Polygroup has failed to explain why it could not could not reasonably have located this additional prior art reference earlier.

For these reasons, the Court concludes that Polygroup did not act diligently in either seeking to amend its prior art statement to add the Mount Washington tree as prior art or in seeking to add an inequitable-conduct counterclaim to its answer. Accordingly, Polygroup's motions to amend are denied.

## III.    Order

Consistent with the discussion above, the Court enters the following Order.

1.  Polygroup's motion to compel discovery **(ECF No. 551)** is **DENIED IN PART and GRANTED IN PART** as stated in this Order.

2.  Polygroup's motions to amend its prior art statement and to amend its answer to assert an inequitable-conduct counterclaim **(ECF Nos. 561, 576)** are **DENIED**.

Date: February 16, 2021

　_s/Katherine Menendez_____
Katherine Menendez
United States Magistrate Judge